## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

GEORGE LEDBETTER,

                    Plaintiff,

    v.

TRANS UNION, LLC,

                    Defendant.

Civil Action No. 2:25-cv-12998

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff George Ledbetter ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Defendant Trans Union, LLC ("Trans Union" or "Defendant").

## INTRODUCTION

1.     Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* by the Defendant.  Plaintiff contends Defendant failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports and consequently reported inaccurate information about Plaintiff.  "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

1

## JURISDICTION AND VENUE

2.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

3.    Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

4.    Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5.    Plaintiff is a natural person who resides in Hamtramck, Michigan.

6.    Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

7.    Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f)).

8.    On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 USC

2

1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union can be served at their Registered Agent Illinois Corporation Service Company at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

9.      During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

10.     Defendant regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 USC § 1681a(d), to third parties. Defendant regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

11.     During all times pertinent to this Complaint, Defendant acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

12.     Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violations.

## **FACTUAL BACKGROUND**

13.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

14.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

15.     Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

16.     The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

17.     Defendant, one of the three major consumer reporting agencies (at times referred to collectively as "CRAs" and individually as a "CRA"), in the United States, regularly publishes and distributes credit information about Plaintiff and other consumers through the sale of consumer reports.

18.     Defendant obtains consumer information from various sources. Some consumer information is sent directly to Defendant by furnishers, and other information is independently gathered by Defendant from third party providers, vendors or repositories, like computerized reporting services like PACER or Lexis-Nexis.

19.     Defendant also obtains consumer information from other CRAs (who commonly share information).

20.     Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information, with the intention of including it in the consumer reports Defendant sells to third parties for profit.

21.     The diligence Defendant exercises in uncovering and recording consumer bankruptcy filings is not replicated in Defendant's subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

22.     Defendant's consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit

Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

23.     The majority of institutions that offer financial services (*e.g.,* banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendant's reports.

24.     The information Defendant includes in consumer reports contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

25.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

26.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a) "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b) The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

27.    Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by Defendant in its consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

28.    A consumer's income, however, is not included in their consumer report; only their amount of debt is.

29.     Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

30.     The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

31.     A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting as having a zero-dollar balance.

32.     Defendant is well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged; both such exceptions are rare and furthermore identified on the individual consumer's bankruptcy docket sheet.

33.     Additionally, information indicating that a specific debt has not been discharged but instead was reaffirmed or successfully challenged through an adversary proceeding, is retrieved from the same sources from which Defendant independently obtains consumer bankruptcy case information.

34.     Defendant also receives information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

35.     However, Defendant regularly reports inaccurate information about consumers after they receive a Discharge Order.

36.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendant frequently reports information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

37.     Defendant regularly publish consumer information that conflicts with information: provided by data furnishers to Defendant, already included in Defendant's credit files, contained in public records that Defendant regularly accesses, and/or sourced through Defendant's independent and voluntary efforts.

38.     Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

39.     Defendant routinely report inaccurate, and materially misleading information about consumers like Plaintiff, without verifying or updating the information as required by § 1681e(b), despite possessing information inconsistent

with the reported information that establishes the reported information is inaccurate.

40.    Defendant's unreasonable policies and procedures cause it to regularly report consumer information without verifying its accuracy.

41.    Defendant's unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

42.    Defendant knows the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendant's own files.[1]

43.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendant for its inaccurate credit reporting following a Chapter 7 discharge.

44.    Thus, Defendant is on continued notice of its inadequate post-bankruptcy reporting procedures, which cause Defendant to report inaccurate balances, account statuses, payment histories, and/or payment statuses.

_____

[1] Indeed, a bankruptcy discharge is for the "honest but unfortunate debtor," *Grogan v. Garner*, 498 U.S. 279, 287 (1991) and will not be provided to someone who filed bankruptcy in bad faith, failed to report assets, fraudulently transferred assets, engaged in reprehensible pre-bankruptcy conduct such as fraud, defalcation or embezzlement, or caused willful and malicious injury. 11 U.S.C. §§ 727(a), 523(a).

**A.    Allegations Specific to the Credit Reporting of Plaintiff**

45.    Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about July 31, 2024, in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 24-47364-mar).

46.    Plaintiff received an Order of Discharge on or about March 12, 2025.

47.    Thereafter, Plaintiff was not personally liable for his dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

48.    Defendant prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

49.    The allegations in this complaint against Defendant are based on the reporting by Defendant in Plaintiff's May 1, 2025, consumer disclosure.

50.    Defendant obtained notice of Plaintiff's bankruptcy discharge through its routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by the CRAs in Plaintiff's consumer reports.

51.    Plaintiff's credit report dated May 1, 2025, reflects that multiple furnishers had, indeed, notified Defendant that Plaintiff had been subject to Chapter 7 bankruptcy.

52.     In the Public Records section of Plaintiff's consumer reports, Defendant included the bankruptcy case number, court, filing date and the fact that Plaintiff's bankruptcy had been discharged.

53.     Defendant also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

54.     Defendant is aware that it is generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

55.     Defendant should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance but did not.

56.     Defendant failed to report **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 bankruptcy with a zero-dollar balance.

57.     Defendant inaccurately reported Plaintiff's Westlake Financial auto-loan account (the "Account"), starting with ****5765 and opened in May 2023, which pre-dated Plaintiff's bankruptcy filing.

58.     The Account was included in Plaintiff's bankruptcy and discharged on or about March 12, 2025.  Therefore, the Account should have been reported as discharged in bankruptcy, and with a zero-dollar balance.

59.     However, Defendant inaccurately reported the discharged Account as a "***Collection***" and "***Charge-Off***" account.

60.     Defendant additionally inaccurately reported the Account with a ***balance*** of $18,776.00 instead of a zero-dollar balance.

61.     Defendant additionally inaccurately reported the Account as maintaining an ***amount past due*** of $18,776.00 instead of zero dollars.

62.     Defendant did not indicate that the Account was discharged in bankruptcy or report the Account with a zero-dollar balance, despite reporting Plaintiff's bankruptcy in the public records section of Plaintiff's consumer report and reporting other pre-bankruptcy accounts as "Discharged/Included in Bankruptcy Chapter 7," and/or with zero-dollar balances.

63.     The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially whereas here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

64.    The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

65.    According to Defendant, a charge-off means the lender has written the account off as a loss and the account is closed to future charges, the time frame is generally between 120 and 180 days after the consumer become delinquent, and a charge-off does not mean that the consumer no longer owe the debt; the consumer is still legally obligated to pay the debt.

66.    Notably, the other national consumer reporting agency, Experian, did not inaccurately report the Accounts like Equifax.

67.    Westlake Financial furnished information to Defendant that indicated Plaintiff's debt was included or discharged in bankruptcy, and/or had a zero-dollar balance after the bankruptcy discharge, but Defendant rejected or otherwise overrode the data it received.

68.    Alternatively, Defendant knew from past experiences that Westlake Financial furnished inaccurate information regarding discharged debts or has historically failed to employ reasonable procedures to ensure it properly updates consumer debts after a Chapter 7 Bankruptcy is discharged.

69.    Nevertheless, Defendant blindly relied on the information provided by Westlake Financial even though this information conflicted with or was

contradicted by information contained in Defendant's records, as well as Defendant's knowledge regarding Plaintiff's bankruptcy and discharge.

70.    Defendant's reliance on the furnisher, Westlake Financial, was therefore unreasonable.

71.    Defendant inaccurately reported that Plaintiff owed a balance that Plaintiff did not actually owe and also reported inaccurate account statuses and/or payment histories.

72.    Defendant inaccurately reported the Account as a "Charge-Off" after the Account was discharged in Chapter 7 Bankruptcy and therefore had a zero-dollar balance.

73.    Defendant failed to indicate that the Account had a zero-dollar balance and/or was included/discharged in Chapter 7 Bankruptcy, and instead inaccurately reported this as a "Charge-Off."

74.    Defendant's reporting of the Account is patently false/incorrect and therefore inaccurate.

75.    If not patently false/incorrect, Defendant's reporting of the Account is materially misleading and therefore inaccurate.

**B.     Plaintiff's Damages**

76.     Upon information and belief, had Defendant accurately reported the Account with a zero-dollar balance, Plaintiff's credit scores and/or DTI would have been better.

77.     Defendant's reporting of an additional $18,776.00 of debt which Plaintiff did not actually owe increased his DTI since the debt was substantially greater, but the income was unchanged.

78.     The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed for bankruptcy.

79.     The inaccurate reporting by Defendant suggests to creditors that Plaintiff is guilty of a bad act and was not deserving of receiving a discharge of the Account.

80.     After Plaintiff's bankruptcy discharge, in or around March 18, 2025, Plaintiff applied for an AmeriCredit auto loan and was denied – due to the inaccurate reporting of the Account by Trans Union.

81.     After Plaintiff's bankruptcy discharge, in or around March 18, 2025, Plaintiff applied for a Royal Oak Ford auto loan and was denied – due to the inaccurate reporting of the Account by Trans Union.

82.     After Plaintiff's bankruptcy discharge, in or around March 18, 2025, Plaintiff applied for an auto loan from Consumer Portfolio Services.

83.     Plaintiff was ultimately able to secure the auto loan from Consumer Portfolio Services, but, upon information and belief, at a higher interest rate and at less favorable credit terms, due to the inaccurate reporting of the Account by Defendant.

84.     Defendant's inaccurate reporting of the Account, along with additional information belonging to Plaintiff, was published to potential creditors by Defendant during the process of Plaintiff's credit applications.

85.     As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

86.     As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

87.     Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, violation of Plaintiff's right to privacy, and anxiety.

<u>COUNT I</u>
**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)**

88.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

89.    The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

90.    Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after a consumer Plaintiff received a Discharge Order.

91.    Defendant independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily reported the same in Plaintiff's consumer reports.

92.    When Defendant procured and published Plaintiff's bankruptcy information, they had an obligation to ensure they followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

93.    Defendant knew or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendant knew

or should have known of its obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

94.    These obligations are well established by the plain language of the FCRA, in promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendant from which Defendant is on notice of its unreasonable procedures concerning the reporting of discharged debts.

95.    Additionally, Defendant possesses or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

96.    Despite knowledge of these legal obligations, Defendant willfully and consciously breached its known duties and deprived Plaintiff of Plaintiff's rights under the FCRA.

97.    In this case, Defendant inaccurately reported accounts that Defendant knew predated Plaintiff's Chapter 7 Bankruptcy, were included and discharged by Plaintiff's bankruptcy discharge.

98.    Defendant had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information it published in Plaintiff's consumer reports, including Plaintiff's bankruptcy case number, court, date of filing and date of discharge.

99.     Defendant is also on notice from other tradelines reported by Defendant that indicate Plaintiff's accounts were included in and discharged in bankruptcy.

100.    Defendant received notice of Plaintiff's bankruptcy discharge through public records, its own files, and information provided by data furnishers.

101.    Defendant knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

102.    Yet in this case, Defendant reported the Account, which predated Plaintiff's bankruptcy, as a "Charge-Off" account without any indication the account was discharged or had a zero-dollar balance.

103.    Defendant violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/report, and by also failing to report accurate information when Defendant knew or should have known the information Defendant is reporting is inaccurate, and/or otherwise contradicted by information known by Defendant, reported to Defendant, and/or reasonably available to Defendant.

104.    Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

105. Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

106. Defendant's    inaccurate    reporting    damaged    Plaintiff's creditworthiness.

107. Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

108. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

109. Defendant is a direct and proximate cause of Plaintiff's damages.

110. Defendant is a substantial factor in Plaintiff's damages.

111. Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendant for the following:

a)   Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

b)   An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

c)   An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

d)   An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

e)   Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

f)   Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## <u>JURY DEMAND</u>

Plaintiff hereby demands jury trial on all issues so triable.

Dated: September 22, 2025           */s/ Levi Y. Eidelman*
                                    Levi Y. Eidelman, NY Bar No. 5742499
                                    **CONSUMER JUSTICE LAW FIRM**
                                    72-47 139th Street
                                    Flushing, New York 11367
                                    T: (718) 360-0763
                                    F: (480) 613-7733
                                    E: leidelman@consumerjustice.com

                                    *Attorneys for Plaintiff George Ledbetter*